

**SIGNED this 26 day of July, 2005.**

<u>                                                     </u>
**FRANK R. MONROE**
**UNITED STATES BANKRUPTCY JUDGE**

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | CASE NO. 03-14768-FM |
| RUSSEL BLANE FOSTER | ) | (Chapter 13) |
| and DENA FAYE FOSTER | ) | |
| <u>            DEBTORS      </u> | ) | |
| RUSSEL BLANE FOSTER | ) | |
| and DENA FAYE FOSTER | ) | |
| | ) | |
| PLAINTIFFS | ) | |
| vs. | ) | ADVERSARY NO. 04-1117-FM |
| | ) | |
| AMERIQUEST MORTGAGE | ) | |
| COMPANY | ) | |
| DEFENDANT | ) | |

<u>MEMORANDUM OPINION</u>

     The Court held a trial of the above-referenced and numbered adversary proceeding on

January 26, 2005.  This trial arises out of a complaint to determine the validity and extent of a lien

and seeking a declaratory judgment action pursuant to Federal Rule of Bankruptcy Procedure

1

7001(2) and (9). At the conclusion of the proceedings, the Court took the matter under advisement. This Court has jurisdiction of this proceeding pursuant to 28 U.S.C. §1334(b) and (e). Venue lies in this Court pursuant to 28 U.S.C. §1409(a), in that the subject matter relates to a case filed under Title 11. This Memorandum Opinion is being issued as written Findings of Fact and Conclusions of Law as required by Bankruptcy Rule 7052.

<u>Findings of Fact</u>

On August 23, 2001 Ameriquest Mortgage Company ("Ameriquest") entered into a Texas Home Equity Adjustable Rate Note ("Note") with Russell Foster, but not Dena Foster. On or about the same day, Ameriquest entered into a Texas Home Equity Security Instrument ("Security Instrument") with both Russell and Dena Foster. Pursuant to the Note and Security Instrument the Fosters granted a lien to Ameriquest with respect to 6.03 acres in Williamson County, Texas. At all times the real property was designated for agricultural use with the Williamson County Appraisal District ("WCAD") either pursuant to Article VIII-1-D or Article VIII-1-D1 of the Texas Constitution.

On November 4, 2003, the Fosters brought this Adversary Proceeding as a response or counterclaim to the secured Proof of Claim of $161,294.40 filed by Ameriquest in their related Chapter 13 bankruptcy. The Fosters sought declaratory relief regarding the amount claimed in said Proof of Claim and requesting a declaration under the Texas Constitution that the lien asserted by Ameriquest was void.

The Court, in a summary judgment hearing on October 6, 2004, held that the real property that secured the credit extension was designated for agricultural use and therefore the Note and Security Agreement executed by the Fosters and Ameriquest violated the Texas Constitution,

2

Article XVI, §50(a)(6)(I).  The Court also determined that the Fosters had given Ameriquest notice of this loan defect and that Ameriquest failed to cure the defect within a reasonable time.  The Court entered an Order Granting Motion for Summary Judgment on October 14, 2004.

As to the remaining issues heard at trial, the Fosters also ask this Court to determine the amount of previously paid principal and interest that Ameriquest must forfeit pursuant to the Texas Constitution and to grant an award of reasonable and necessary attorney fees and costs pursuant to the Texas Declaratory Judgment Act.

Ameriquest as an affirmative defense requests that the Fosters be estopped from receiving the protection of the Home Equity Lending Amendment because the Texas Home Equity Affidavit and Agreement ("Affidavit") the Fosters signed disavows that the property securing the Note is exempt for agricultural purposes.  Ameriquest also requests that if it should fail in its estoppel defense, then as an alternative, this Court should find the Fosters personally liable for the debt pursuant to Article 16, §50(a)(6)( C) because the execution of the Affidavit constitutes an act of fraud.  Additionally, Ameriquest requests  that this Court subrogate it to the rights of the then existing mortgagee (Household Mortgage Services) which was paid off from the proceeds of the home equity loan.

In response to Ameriquest's assertion, the Fosters ask this Court to deny the relief requested and enter judgment that Ameriquest forfeit all principal and interest paid by the Fosters to Ameriquest under the home equity loan and to award them their reasonable and necessary attorney fees and costs.

The parties agree that  the Fosters signed under oath the Affidavit  which includes a statement that the land securing the extension of credit is not designated for agricultural use.

3

Ameriquest paid off an existing home equity loan secured by the property with a portion of the funds loaned at issue. Ameriquest has received payments of principle and interest totaling $8,458.16. The Fosters' counsel has asserted a claim for $59,130.00 in attorney's fees in prosecution of the claims asserted in this proceeding and for out-of-pocket expenses in the amount of $2,767.89.

At the conclusion of the trial, the Court found that Ameriquest's standard business practice is to prepare and furnish the Note, Security Agreement and Affidavit as form documents in all of its home equity transactions. Among these documents, Ameriquest routinely requires the execution of the Affidavit, and Ameriquest would not have originated the loan to the Fosters in this case unless the Fosters signed their standard forms being the Note, Security Instrument and Affidavit.

The Court also determined the following regarding Ameriquest's lending practices: that Ameriquest does not routinely perform an independent investigation regarding its obligations under the Home Equity Lending Amendment, with the sole exception of the 80% loan-to-value ratio requirement (Ameriquest investigated this one restriction in this case, as it routinely does in all transactions, by obtaining an independent valuation appraisal); that the Fosters' agricultural exemption was a matter of public record easily obtainable by Ameriquest; that Ameriquest had the means to acquire knowledge of the Fosters' exemption, but failed to do so; that instead of performing the usual lender investigations regarding its various obligations under the Home Equity Lending Amendment, Ameriquest blindly relied on the form and content of its documents as the sole means to assure compliance and that such practices appeared substandard for the industry, if not negligent.

The Court determined that Mrs. Foster was unaware of the restriction against securing a

4

home equity loan with agriculturally exempt property, and also that Mrs. Foster would have informed Ameriquest of the exemption had anyone asked her.  Not only did Ameriquest fail to ask Mrs. Foster this question, but it failed to ask her any questions at all.  This fact is evident because Ameriquest did not send a representative to the loan closing, which was the point in time that the Fosters signed all form documents relied upon by Ameriquest to assure its compliance with the Home Equity Lending Amendment.  There was no evidence whatsoever adduced with respect to the actual loan application process other than the lender's representative's testimony that it is Ameriquest's practice to inquire whether agricultural exemptions exist, but no actual testimony as to whether that occurred with this lending transaction.

From all appearances, Ameriquest's shoddy lending practices [as evidenced by their loan to the Fosters] appear to be the result of its desire to earn extremely high fees from these type loan transactions and to spend as little time investigating and closing them as possible.

<u>Legal Issues</u>

1) Whether the Fosters are estopped from claiming the property securing the credit extension designated for agricultural use on the grounds that the Affidavit states otherwise?

2) Whether the Fosters committed actual fraud in obtaining the credit extension when they executed the Affidavit and are personally liable for the indebtedness?

3) Whether Ameriquest is entitled to be equitably subrogated to the rights of the existing mortgagee?

4) Whether the Fosters are entitled to reasonable and necessary attorney fees and costs?

<u>Conclusions of Law</u>

<u>Estoppel</u>

5

The Texas Supreme Court has held that a homestead claimant is not estopped to assert his homestead rights in property on the basis of declarations made to the contrary if, at the time of the declarations, the claimant was in actual use and possession of the property. *In re Niland,* 825 F.2d 801 at 808 (5th Cir. 1987). As stated by the Texas Supreme Court;

> The Constitution forbidding the fixing on the homestead liens other than those expressly permitted therein, no defense of estoppel can be raised by a lender who has attempted to secure a lien on homestead in actual use and possession of the family, based on declarations of the husband and wife made orally or in writing to the fact. If the property is in fact a homestead, lenders must understand that liens cannot be fixed upon it and that declarations of husband and wife to the contrary, however made, must not be relied upon.

*Texas Land & Loan Co. v. Blalock,* 13 S.W. 12 (Tex. 1890); *See also, Lincoln v. Bennett,* 156 S.W. 2d 504 (Tex. 1941); *Patterson v. Federal Deposit Insurance Company,* 918 F.2d 540 (5th Cir. 1990).

This rule which at first may seem unjust to lenders recognizes the reality that many in financial difficulties will sign anything to obtain money from lenders, and that if not put to a duty of inquiry, many lenders will simply have the borrower execute an affidavit stating that the property is not claimed as homestead. *In re Niland,* 825 F.2d at 809. To permit such practice would in effect render the constitutional homestead protection nugatory. *Id.* Thus, in Texas, a homestead claimant is not estopped to assert his homestead rights in property on the basis of declarations made to the contrary.

In raising the defense of estoppel, Ameriquest asserts two arguments. First, Ameriquest contends that the instant case falls into one of the exceptions where estoppel has actually been applied in a homestead situation. This Court disagrees. Ameriquest is correct that there have been circumstances where courts have held that lender's defense of estoppel can be successfully claimed in homestead cases. However, the exceptions are construed very narrowly and apply only in very specific circumstances. The Texas Supreme Court set out three categories in which a homestead

claimant would be estopped from claiming his homestead: (1) when the owners are not actually occupying the property or so using it at the time the mortgage is executed [so that its status is dubious] represent that it is not their homestead; (2) when the owners create a lien by entering into a simulated transaction which has all the outward appearance of a valid, unconditional sale, but which is in fact a mortgage; (3) when the owners represent that existing notes are valid mechanic's lien notes for improvements, secured by a mechanic's lien contract properly executed. *In re Niland*, 825 F.2d at 809.

These exceptions are inapplicable to our situation. When the Fosters entered into the credit extension, both parties were aware that the property in question was a homestead. Further, the instant case did not involve any sales transaction or a mechanic's lien. Here, the lender without any independent inquiry or investigation simply relied on a declaration made in the form affidavit it supplied which was contrary to the facts. This situation is analogous to the cases in which Texas courts have held the estoppel defense inapplicable.

Here, the Court also determined that Ameriquest's standard business practice did not include a routine investigation of its obligations under the Home Equity Lending Amendment. Ameriquest failed to inquire at any time whether the property was agriculturally exempt. Further, no representative of Ameriquest attended the loan closing when the Fosters executed all the documents purportedly relied upon by Ameriquest to assure its compliance with the Home Equity Lending Amendment. Ameriquest's practices are exactly the practices that Texas courts do not like. Estoppel has not been allowed as a defense in circumstances such as these. As the lender in *Texas Land & Loan Co. v. Blaylock* could not blindly rely on the borrower's declaration that the property is not homestead, neither can Ameriquest blindly rely on the assertion that the property is

7

agriculturally exempt especially since it has performed no investigation on its own and the salient facts were of public record and, therefore, readily obtainable.

Second, Ameriquest asserts that the rule prohibiting estoppel to enforce a homestead disclaimer should not extend to prohibit use of estoppel to enforce a disclaimer of tax exemption designation. Ameriquest thus contends that the disclaimer of tax exemption should be estopped under the doctrine of equitable estoppel and quasi-estoppel.

A) <u>Equitable Estoppel</u>

In order to prevail under the doctrine of equitable estoppel, one must show (1) a false representation or concealment of material facts; 2) made with knowledge, actual or constructive, of those facts; (3) with the intent that the representation be acted on; (4) to a party without knowledge or means of acquiring knowledge of the facts; and (5) who detrimentally relies on the representation. *Medical Care America, Inc. v. National Union Fire Insurance Company,* 341 F.3d 415 at 422 (5th Cir. 2003). The burden of proving estoppel and the essential elements thereof is on the party asserting it, and the failure to prove any one or more of the elements is fatal. *Id.* at 422. Ameriquest and the Fosters dispute whether the fourth element–"to a party without knowledge or means of acquiring knowledge"–of equitable estoppel has been satisfied.

Ameriquest believes that all that is required for the creation of estoppel in express misrepresentation cases is that the misrepresentation be communicated, believed and relied upon by the innocent party. It argues that "means of acquiring knowledge" arises only in estoppel by silence cases, and therefore, the requirement of due diligence and reasonable investigation is not applicable in cases of express written misrepresentation. Cases relied upon by Ameriquest for this position, however, are either irrelevant or actually contrary to Ameriquest's argument.

8

First, Ameriquest fails to support its assertion that "the means of acquiring knowledge component of the no knowledge element arises only in estoppel by silence cases." Ameriquest refers to *Storms v. Tuck* stating that estoppel by silence arises where a person is under a duty to another to speak, but refrains from doing so. *Storms v. Tuck,* 579 S.W.2d 447 (Tex. 1977). It is true that the *Storms* court discusses the principle of "estoppel by silence" but nowhere does it determine that "the means of acquiring knowledge" element of equitable estoppel arises only in estoppel by silence cases. The *Storms* decision addressed the doctrine of "estoppel in pais" which holds that the owner of land may be estopped to deny the existence of an easement by making representations that have been acted upon by a purchaser to his detriment. *Id.* The *Storms* court also acknowledged that there may be no duty to speak out if the other party has equal access to the facts. *Barfield v. Howard M. Smith Company of Amarillo*, 426 S.W.2d 834 (Tex.1968).

Second, Ameriquest asserts that all that is required for the creation of estoppel is that the misrepresentation be communicated to, believed and relied upon by the innocent party and again cites to *Storms.* However, this is an incorrect reading of the case. The *Storms* court states, "[e]ssential to the creation of estoppel is that the misrepresentation be communicated to, believed and relied upon by the innocent party." Essential cannot be construed to mean "all". If as Ameriquest asserts, "all" that was required to establish estoppel is for a misrepresentation to be communicated, believed and relied upon by an innocent party, then the five elements of estoppel which Texas courts have continued to hold as threshold requirements in raising a defense will be rendered nugatory.

It is Texas law that a party claiming an estoppel must have used due diligence to ascertain

9

the truth of the matters upon which he relies in acting to his detriment. *Medical Care America, Inc.,* 341 F.3d 415 at 423; *Barfield v. Howard M. Smith Company of Amarillo,* 426 S.W. 2d 834 at 838 (Tex. 1968). There can be no estoppel when the party claiming the estoppel conducts himself with careless indifference to means of acquiring information reasonably at hand. *Barfield,* 426 S.W. 2d at 839. This would especially be the case in the home equity lending industry where the Texas legislature has imposed such onerous requirements with respect to home equity lending. Ameriquest had adequate means of discovering whether the Fosters' property was agriculturally exempt as such information is available to the public at the Williamson County Appraisal District. Although the information was easily obtainable, Ameriqust blindly relied on the form and content of its own documents as the sole means of assurance. Again, as this Court has mentioned before, Ameriquest did not ever ask the Fosters if the property was Ag-Exempt nor did it have a representative attend the loan closing to make such a determination. These facts establish that Ameriquest acted carelessly and without due diligence when entering and closing the loan agreement with the Fosters. Although Ameriquest had means easily available to ascertain whether the Fosters' property had been claimed agriculturally exempt, Ameriquest negligently failed to do anything on its own. Thus, as Ameriquest has failed to prove the fourth element, the defense of equitable estoppel also fails.

Quasi-Estoppel

In addition to the equitable estoppel defense, Ameriquest asserts that the doctrine of quasi-estoppel is applicable to this situation. This Court must disagree. Quasi-estoppel precludes a party from asserting, to another's disadvantage, a right inconsistent with a position previously taken by him. *Atkinson Gas Company v. Albrecht,* 878 S.W.2d 236 at 240 (Tex. App.–Corpus Christi 1994). The doctrine forbids a party accepting the benefits of a transaction or statute and then subsequently taking

10

an inconsistent position to avoid corresponding obligations or effects. *Id.* Unlike equitable estoppel, quasi-estoppel does not require a showing of misrepresentation or detrimental reliance. *Id.*

It is irrelevant in this case because there was neither a knowing misrepresentation by the Fosters nor actual reliance by Ameriquest. Regardless, Ameriquest cannot claim quasi-estoppel because it had the reasonable means of acquiring knowledge of the Ag-Exempt status of the Fosters' property but it failed to do so. It could have asked the Fosters the question. It could have had the question of "Ag Exempt status" of the property on the loan application. It could have asked to see the County Appraisal District Notice of Appraisal value which is sent each year to each landowner in the county and which would have disclosed the status of the property with regard to all exemptions. It could have checked the real property records itself. However, Ameriquest did nothing other than have the Fosters sign a bunch of form documents at a closing it did not even attend. Case law supports that "any" form of estoppel cannot arise in favor of one who has been guilty of contributory negligence. *El Paso Nat'l Bank v. Southwest Numismatic Investment Group,* 548 S.W.2d 942 at 948 (Tex. Civ. App.–El Paso 1977, no writ); 31 C.J.S. Estoppel s 102 (1964). The rationale for this rule is that an estoppel resting wholly on equity cannot be used to shift a loss from one careless person to another. *Id.* citing *City of Tyler v. Bruck,* 267 S.W.2d 429 (Tex. Civ. App.-Texarkana 1954, writ ref'd n.r.e.) Thus, equity will not relieve a person from his erroneous acts or omissions resulting from his own negligence. *Id.* Ameriquest's standard business practice is one of carelessness; its practice was to merely rely on the borrower's sworn statement, period. Therefore, the doctrine of quasi-estoppel is unavailable to Ameriquest.

Fraud

As an alternative to the estoppel defenses, Ameriquest requests that this Court find that the

11

Fosters committed actual fraud by signing the Affidavit, and thus, pursuant to Tex. Const. art. 16 §50(a)(6)(C), the Fosters are personally liable for the debt, even if the lien becomes void. The Tex. Const. art. 16, §50(a)(6)(C) provides:

> The homestead of a family, or of a single adult person, shall be, and is hereby protected from forced sale, for the payment of all debts except for ... an extension of credit...that is without recourse for personal liability against each owner and the spouse of each owner, unless the owner or spouse obtained the extension of credit by *actual fraud*.

This section provides a remedy to a lender against a borrower if there is a showing that the borrowers obtained the extension of credit by committing actual fraud. *See e.g.* TAC, Title 7, Part 8, Chapter 153 §153.4. To prove actual fraud, the burden of proof is on Ameriquest to show: (1) a false representation, (2) of a material fact, (3) made intentionally and knowingly, (4) with intent to mislead, (5) reliance by the party misled, and (6) resulting damages to the misled party. *Arkoma Basin Exploration Co. v. FMF Associates 1990-A, Ltd.,* 118 S.W.3d 445 at 451 (Tex. App.–Dallas 2003). Actual fraud must be proved by clear and convincing evidence. *Id.* at 451.

In determining the legal sufficiency of evidence to support a finding under the standard of clear and convincing evidence, the reviewing court examines all the evidence in the light most favorable to the finding. *Id.* at 452; *In re J.F.C.,* 96 S.W.3d 256, 266 (Tex. 2002). Viewing the evidence in the light most favorable to Ameriquest, Ameriquest has still failed to show that the Fosters committed actual fraud.

To prove actual fraud, the party claiming such much prove the intent with which the representation is made. Actual fraud is different from constructive fraud in that it requires such proof where constructive fraud merely requires that the misrepresentation was made innocently or negligently and the injured party was damaged as a result of his reliance upon such misrepresentation. *Arkoma* at 451. Intent, however, may be shown by acts, representations, and subsequent conduct.

12

*Mayfield v. Ivey,* 1999 WL 1240932 (Tex. App.–Dallas 1999).

The record reflects that Mrs. Foster was unaware of any prohibition against securing a home equity loan with Ag-Exempt property. And, no one from Ameriquest ever asked her if any portion of her homestead was Ag-Exempt; nor did anyone explain the home equity lending requirements or attend the loan closing. There is woefully insufficient evidence for the Court to find that the Fosters made a knowing and intentional misrepresentation to Ameriquest. The fact is that the Fosters were simply not aware of the prohibition against securing a home equity loan with Ag-Exempt property.

Equitable Subrogation

Both parties stipulated that Ameriquest paid off an existing mortgage, secured by the Fosters' homestead, with a portion being at issue before this Court. Ameriquest's extension of credit to the Fosters constitutes in part a "cash out" refinance in which Ameriquest paid off the prior mortgagee, Household Mortgage Services, before distributing the balance of the loan proceeds directly to the Fosters. Ameriquest asserts that it is equitably subrogated to the rights of Household Mortgage Services whose loan was paid off and whose lien was released as a result of payment from the proceeds of Ameriquest's extension of credit. The amount Ameriquest requests be subrogated is $36,482.07.

Subrogation commonly arises in the context of mortgage law when a lender or other third party advances funds to pay off a prior lien on the property. *Vogel v. Glickman,* 117 F.Supp. 2d 572 (W.D. Tex. 2000). The *Vogel* court citing the Texas Supreme Court writes:

> The doctrine of subrogation is not applied for the mere stranger or volunteer who has paid the debt of another without any assignment or agreement for subrogation, without being under any legal obligation to make the payment, and without being compelled to do so for the preservation of any rights or property of his own. . .One who pays a debt at the instance of the debtor, under such circumstances that it appears to have been contemplated by the parties that he should become entitled to the benefit of the security for the debt held by the creditor from

the debtor, may, as against the debtor, be subrogated to the benefit of such security, and of the debt which he has discharged.

*Oury v. Saunders*, 77 Tex 278, 280, 13 S.W. 1030, 1031 (1890). Texas courts have routinely upheld this doctrine, even in cases where subsequent liens were executed with fraudulent misrepresentations by the homeowners. *Rubarts v. First Gibralter Bank, FSB*, 896 F.2d 107 (5th Cir. 1990). Once valid, the lien does not become invalid against the homestead simply because the original debt has been refinanced. *Benchmark Bank v. Crowder*, 919 S.W. 2d 657 (1996). To hold otherwise, in fact, would defeat the very purpose of homestead protection. Homestead owners must have the ability to renew, rearrange and readjust the encumbering obligation to prevent a loss of the homestead through foreclosure. *Machicek v. Barcak*, 141 Tex. 165, 170 S.W.2d 715, 717 (1943).

Texas recognizes two kinds of subrogation: contractual subrogation and equitable subrogation. *Vogel* at 735.. Equitable subrogation is governed by principles of equity and occurs whenever a subsequent lender pays off an existing debt. *Vogel v. Veneman*, 276 F.3d 729, 735 (5th Cir. 2002). By contrast, contractual subrogation arises when a person advances money to take up and extend indebtedness secured by a vendor's lien on land under an agreement that such person shall stand in the place of the original holder of the indebtedness. *Vogel v. Glickman*, 276 F.3d at 735.

The Fosters executed a Texas Home Equity Security Instrument whereby they agreed in Paragraph 24 that Ameriquest would be contractually subrogated "to any and all rights, superior title, liens and equities owned or claimed by any owner or holder of any liens and debts outstanding immediately prior to execution hereof, regardless of whether said liens of debtor are acquired by Lender by assignment or are released by the holder thereof upon payment." However, Ameriquest did not claim in its pleadings that it was contractually subrogated. It only claimed it was equitably subrogated to the amount and rights of the lienholder which it paid off when it extended credit to the

14

Fosters.

Two cases support Ameriquest's assertion that it is equitably subrogated to the rights of Home Mortgage Services. *Vogel v. Veneman, 276 F.3d 729; Rubarts v. First Gibralter Bank*, 896 F.2d 107 (5th Cir. 1990). In *Vogel*, the Vogels purchased a parcel of land by obtaining purchase money financing from Westside Bank in exchange for a vendor's lien on the property. Later, the Vogels refinanced the Westside note with the Federal Land Bank ("FLB") and Westside transferred and assigned the deeds of trust and vendor's lien to FLB. The Vogels then obtained a secured loan from Travis Savings & Loan Ass'n of San Antonio. FLB was paid at the closing of the Travis loan and the remaining proceeds were used by the Vogels to pay property taxes and operating expenses. The Vogels then formed a wholly owned corporation and conveyed the property to Vogel Farms by warranty deed. Vogel Farms then obtained secured loans from Mercantile Bank and the Small Business Administration which loans were both subject to the initial lien. Vogel Farms ultimately paid the SBA loan and then refinanced the Travis and Mercantile notes with the Farmers Home Administration now known as Farmers Service Agency ("FSA"). From these proceeds, FSA paid both the Travis and Mercantile notes as well as property taxes and an unrelated debt owed by the Vogels. Vogel Farms then defaulted on this debt. Vogel Farms also reconveyed the property back to the Vogels individually after the Vogels filed a "Designation of Homestead" in the appropriate county records. The Vogels contended that any lien on the property was an impermissible encumbrance on their homestead.

The Fifth Circuit affirmed the district court holding that subsequent lenders will succeed to the rights of prior lenders and become entitled to all rights of the prior lenders in relation to the debt by the doctrine of subrogation. The Circuit stated, "the chain of financings. ..in which each lender

15

advanced money to extinguish prior amounts owing. . .establishes that FSA was both equitably and contractually subrogated to the original lender's (Westside) valid purchase money lien on the Vogels' homestead." *Vogel*, 276 F.3d at 729.

Likewise in *Rubarts*, the Fifth Circuit held that the subsequent lender is entitled to the benefit of a lien against the property in the amount that was used to pay off the original mortgage. *Rubarts*, 896 F.2d 107. By paying off the remaining balance of the initial mortgage, the subsequent lender did not lose the lien as to that amount and was equitably subrogated to the rights of the original mortgagee. *Id.* at 114.

The Rubarts executed a first mortgage note and lien on a residence in favor of Sherman Savings which later became First Texas Savings Association. Mr Rubarts then approached First Texas about securing a loan for his wholly owned corporation, Diversified Industries, Inc. First Texas would not accept any of Diversified's collateral for a loan as such was already too heavily encumbered. The Rubarts then arranged to have Diversified purchase their residence in order for Diversified to secure the desired loan. The Rubarts continued (with the knowledge of First Texas) to use the residence as their homestead. First Texas then made the loan which Diversified used to pay off the first lien to First Texas on the residence and the remainder to pay off some of Diversified's debts.

The Rubarts then reconveyed the residence to themselves. Diversified defaulted on its note to First Texas. Mr. Rubarts then declared personal bankruptcy and claimed the residence exempt. He also brought an action to declare First Texas' trust lien on the residence unenforceable.

Although the court held the lien unenforceable, it agreed that First Texas was entitled to subrogation. The deed of trust executed as part of the loan to Diversified specifically provides for

16

subrogation.  Under the terms of that contractual provision, First Texas was entitled to the benefit of a lien in the amount of the first lien that was paid off when it made the second loan.

And, even if contractual [subrogation] were not available to First Texas, First Texas would enjoy equitable subrogation.  *Id.* at 115.  Here, there was no question but that the predecessor of First Texas obtained a valid lien at the time of the original mortgage in 1968.  That loan was in every respect, a valid mortgage loan on a residential homestead.  By paying off the remaining balance, First Texas should not stand to lose the lien as to that amount, but only as to the additional amount loaned to Diversified, when, as we have held, First Texas had constructive knowledge of the Rubartses' intentions.

To that effect, it is well established in Texas that

[o]ne who advances money to pay off an incumbrance on realty at the instance of . . . the owner. . . either on the express understanding or under circumstances from which an understanding will be implied, that the advance made is to be secured by a first lien, is not a mere volunteer, and in the event the new security is for any reason not a first lien. . . the holder of such security, if not chargeable with culpable and inexcusable neglect, will be subrogated to the rights of the prior incumbrances. ...

*Rubarts* at 115 citing *Kone v. Harper,* 297 S.W. 294, 297 (Tex. Civ. App.–Waco 1927), *aff'd sub nom.* *Ward-Harrison Co. v. Kone,* 1 S.W. 2d 857 (Tex. Comm'n App. 1928, judgm't adopted).  *Accord* *Sanger Bros v. Ely Walker Dry Goods Co.,* 207 S.W. 348, 349-50 (Tex. Civ. App.–Ft. Worth 1918, writ ref'd); *Whiteselle v. Texas Loan Agency,* 27 S.W. 309, 313-14 (Tex. Civ. App.1894 writ ref'd.); *Lewis v. Investors Sav. Ass'n,* 411 S.W. 2d 794, 796 (Tex. Civ. App.–Ft. Worth 1967, no writ).

The Fosters argue that Ameriquest is not entitled to equitable subrogation based on the decision of *Smart v. Tower Land and Investment Co.,* 597 S.W.2d 333 (Tex. 1980).  In *Smart* the mortgagee brought an action against the mortgagor for reimbursement of payment of ad valorem taxes accrued during the time the mortgagor owned the real estate in question.  Previously, Tower had sold

some real estate to Smart in which Smart paid part of the purchase with a promissory note secured by a deed of trust containing a non-recourse liability obligation.  Smart defaulted on his note and Tower repurchased the property at a foreclosure sale.  Thereafter, Tower paid the delinquent property taxes which had been assessed on the property during Smart's possession.  Tower tried to collect the taxes from Smart personally by claiming that it was equitably subrogated to the rights of the taxing authorities, who could assert a lien as well as personal liability.

The Texas Supreme Court denied this remedy holding that if parties have fixed their rights by contract to preclude personal liability on the mortgage, as Tower and Smart had done, then the terms of the contract govern as opposed to creating a judicial intervention by equitable subrogation.  *Id.* at 338.  Based on this decision, the Fosters claim that since Ameriquest and the Fosters entered into a contract for a non-recourse loan, the terms of the loan contract govern and Ameriquest is not entitled to equitable subrogation and the Fosters are not personally liable on the mortgage.

*Smart* differs from *Vogel* and *Rubarts*.  In *Smart,* Tower could not be equitably subrogated to the rights of the taxing authorities because Tower had already foreclosed and the original loan was non-recourse meaning no personal liability owed by Smart.  However, the Court recognized that one who pays property taxes assessed on property owned by another can be entitled to subrogation to the taxing authority's lien. *Stone v. Tilley,* 100 Tex.487, 101 S.W. 201, 201-202 (1907).  Here, Tower was not allowed a personal judgment against Smart for tax reimbursement because the original contract had been non-recourse.  Tower had already foreclosed and could not urge subrogation with respect to his lien claim.  This is not the case here.

The Fosters also urge that the concept of equitable subrogation runs contrary to the 1997

Amendment which specifically provides that "cash out" refinancing constitutes a home equity loan that must comply with all of the home equity lending restrictions. Basically, §50(f) requires the refinance of a home equity loan to be a home equity loan itself:

> "A refinance of debt secured by the homestead, any portion of which is an extension of credit described by Subsection (a)(6) of the section, may not be secured by a valid lien against the homestead unless the refinance of the debt is an extension of credit described by Subsection (a)(6)..."

Article XVI, §50(f).

The Fosters argue that when reading §50(f) together with §50(a)(6)(Q)(x), it is obvious that equitable subrogation has no place in home equity lending. Section 50(f) requires a cash-out refinance to be treated as a home equity loan, so application of the doctrine of equitable subrogation to cash-out refinancing renders the forfeiture remedy a nullity at least to the extent of the prior existing mortgage. Section 50(a)(6)(Q)(x) calls for the forfeiture of *all* principal and interest. In construing Article XVI, §50(a)(6)(Q)(x) and §50(f), the Fosters request that this Court avoid a construction that renders either subsection meaningless or inoperative. *Stringer v. Cendant Mortgage Corp.,* 23 S.W. 3d 353, 355 (Tex. 2000). However, equitable subrogation does not render this section meaningless. The language of this section neither revokes nor makes inapplicable the doctrines of contractual or equitable subrogation. If the drafters had intended subrogation not to apply in "cash out" situations it seems they could, and would, have clearly said so. A proper reading of these two sections together with the doctrines of subrogation is to limit the forefeiture of debt to that not used to pay the pre-existing debt secured by a valid lien when either contractual subrogation was agreed to or when *Vogel's* requirements for equitable subrogation are met . This is especially true since there is no language in the home equity amendments that overrule or make inapplicable either contractual or equitable subrogation. This is the only interpretation that gives effect to the home equity amendments and the

19

pre-existing law of subrogation.  There are cases to the effect that common law remains in tact unless a statute clearly changes it.  *Witchita Realty Co. v. City Nat. Bank of Witchita*, 97 F2d 249 (5th Cir. 1938); *Cameron v. Terrell & Garrett, Inc.,* 599 S.W.2d 680 (Tex. Civ. App.-Ft. Worth 1980) *reversed and rendered,* 618 S.W.2d 535 (Tex. 1981).

The Fosters further argue that a lien arising by virtue of equitable subrogation is not on the exclusive list of liens that may be imposed on homestead property and that Texas law specifically declines to expand this exclusive list of liens by allowing equitable liens to be imposed by the courts. *Heggen v. Pemelton,* 836 S.W.2d 145 (Tex. 1992).  However, *Vogel* and *Rubarts, supra,* hold the opposite.  See also, *Means v. United Fidelity Life Ins. Co.,* 550 S.W.2d 302, 309 (Tex. Civ. App.–El Paso 1977 writ ref'd n.r.e.)  When a lender advances funds to pay a valid encumbrance on a homestead under circumstances from which it can be implied at least part of the advancement made if intended to be secured by a first lien on the land encumbered, the new lender is subrogated to the rights of the prior encumbrancers which are superior to the homestead rights, and is entitled to foreclose upon the homestead upon default.  Even if the new lender pays off a  prior encumbrance and receives a void or defective mortgage, the new lender will be subrogated to the discharged encumbrance.  This is true even if the property is homestead property. *Id.*   As explained by the Texas Supreme Court:

> One who discharges the vendor's lien upon land, —*even the homestead,–* either by paying as surety, or at the request of the debtor, or at a judicial sale, which, for irregularities in the process, fails to convey the title, is entitled to be subrogated to the lien of the creditor to the extent of the payment so made.

*Faires v. Cockrill,* 88 Tex. 428, 437 31 S.W. 190, 194(1895)(emphasis added); *see also First Nat'l Bank v. O'Dell,* 856 S.W.2d 410 (Tex. 1993).

Last, the Fosters contend that equitable subrogation is a remedy only available to those who

come into court with clean hands. *In re Canion*, 196 F.3d 579, 585-586 (5th Cir. 1999). The Fosters claim that Ameriquest not only violated the Home Equity Lending Amendment but also it refused to cure its mistake after the Fosters put it on notice and that Ameriquest cannot be both wrong and innocent at the same time. However, even though Ameriquest has violated the Home Equity Lending Amendment, all that it gains by operation of subrogation is the valid lien on the homestead securing the sum of $36,482.07 which was already in place prior to its lending transaction with the Fosters.

All of the foregoing being true, we have a problem. The only evidence in the record with respect to the prior existing mortgage paid by Ameriquest's loan was Mrs. Foster's testimony that she believed such mortgage was also a home equity loan secured by the 6.03 acres of agriculturally exempt property. Ameriquest did not submit any proof that the prior mortgagee's lien was valid. It is Ameriquest's burden to so prove such validity as it is the party requesting the "subrogation" relief. All of the case law in this area references the fact that the prior existing mortgage must be valid in order for an equitable subrogation claim to be successful. Therefore, since there is no evidence that the prior lien was valid, there can be no subrogation.

<u>Attorney Fees</u>

The Fosters request attorney fees be awarded under the Texas Declaratory Judgment Act. The Declaratory Judgment Act provides that a court may award reasonable and necessary attorney's fees as are equitable and just. Tex. Civ. Prac. & Rem. Code Ann. §37.009 (West 2005); *Chambers v. Ochiltree*, 2005 WL 2814288 (Tex. App.-Austin 2004). Attorney fee awards under the Declaratory Judgment Act are left to the discretion of the trial court, subject to the requirement that any fees awarded be reasonable and necessary which is a question of law. *Boquest v. Herring*, 972 S.W.2d 19, 21 (Tex. 1998).

21

Ameriquest asks this Court to deny the Fosters' claim for attorney fees because the Fosters' cause of action under the Texas Declaratory Judgment Act exists solely to pave the way to such an award.

The Declaratory Judgment Act is not available to settle disputes already pending before a court. *Adams v. Fist National Bank,* 154 S.W.3d 859, 873 (Tex. App.–Dallas, 2005); *BHP Petroleum Co. v Millard,* 800 S.W.2d 838, 841 (Tex. 1990). In general, declaratory relief will not be granted where the cause of action has fully matured and invokes a present remedy at law. *Adams,* 154 S.W.3d 859, 873. A Declaratory Judgment Action is improper if declaratory relief is requested for the first time in an amended petition and merely raises the same issue. *Id.* Further, it may not be used solely to obtain attorney's fees that are not authorized by statute. *Breitenfeld v. SAS Institute, Inc.,* 147 S.W.3d 672 (Tex. App.-Dallas 2004). If the request for declaratory relief adds nothing to the suit other than a claim for attorney fees, then the request should be denied.

Ameriquest claims that the Fosters'claim arises under Article XVI, §50 of the Texas Constitution, which does not provide for an award of attorney fees, and that the Fosters' claim for declaratory relief adds nothing to the suit, save a claim for attorney fees. Ameriquest is correct that the remedies section of the Home Equity Lending Amendment, Article XVI, §50(a)(6)(Q)(x) does not provide for an award of attorney fees. Ameriquest is incorrect, however, in its contention that the Fosters' claim for declaratory relief adds nothing to the suit.

The Texas Constitution, Article XVI, §50(a)(6)(Q)(x) describes remedies imposed when a lender fails to comply with the requirements for making a valid home equity loan. However, it does not by its terms enable the borrower to institute a judicial proceeding. Before a borrower may invoke the remedies prescribed by Article XVI, §50(a)(6)(Q)(x), the borrower must obtain a judicial

22

determination that the home equity loan violates one of the protective provisions of the Home Equity Lending Amendment. The Texas Declaratory Judgment Act provides the statutory basis for instituting such a judicial proceeding.

Case law also indicates that other borrowers bringing home equity claims sought their remedies by requesting declaratory relief. For example, in the recent case, *Vincent v. Bank of America, N.A.*, 109 S.W.3d 856 (Tex. App. Dallas-2003), the borrowers successfully sued Bank of America under the Declaratory Judgment Act. Ameriquest itself has been sued successfully under the Declaratory Judgment Act for violation of the Home Equity Lending Amendment:

> "Doody and Carrington have sued in the United States District Court for the Northern District of Texas, seeking declaratory relief. The district court dismissed, holding that the controversy was not ripe because the plaintiffs had not failed to pay on their mortgage, and Ameriquest had not yet begun foreclosure proceedings. In this respect, the district court erred."

*Doody v. Ameriquest*, 242 F.3d 286, 288 (5th Cir. 2001). Therefore, an action for declaratory relief is the appropriate judicial proceeding for obtaining a determination of whether a home equity loan complies with the home equity lending requirement. The Fosters are entitled to their reasonable and necessary attorney fees and costs pursuant to Tex. Civ. Prac. & Rem. Code Section 37.009. The fees as stipulated are $59,730.00 with costs of $2,767.89. However, there has been no stipulation as to their reasonableness which the Court must still determine as well as whether such fees are equitable and just in this situation. Tex. Civ. Prac. & Rem. Code §37.009 (West 2005).

The Fosters' counsel is requesting $59,730.00 in fees based on 262.8 hours logged in connection with this adversary proceeding. Testimony elicited from counsel indicates that counsel spent an inordinate amount of time educating himself with respect to the Home Equity Lending Amendment and violations in connection with agricultural exemption issues as opposed to the amount of time spent actually litigating this case i.e. filing the complaint, discovery, dispositive motions and

trial.  And, although the Court would agree with counsel that this issue is one of first impression as no case law exists to aid  in its interpretation, counsel should not be awarded fees for educating himself in this area when such fees are so disproportionate to the actual amount in controversy here.  Such is not equitable and just in light of this fact.  Counsel is requesting $59,730.00 when the debt in question is $161,295.40 which is more than a third of such debt.  The Court therefore reduces the attorney fees to $40,000.00 with costs allowed of $2,767.89.

<u>Conclusion</u>

The Fosters are not estopped from claiming that the land securing the home equity loan is designated for agricultural use even though the Fosters' Affidavit states otherwise.  Further, Ameriquest has failed to prove that the Fosters committed actual fraud as there was no showing of intent by the Fosters to defraud Ameriquest and therefore, the Fosters are not personally liable for the indebtedness to Ameriquest.

Ameriquest is not equitably subrogated to the prior lien securing the debt that was paid from the proceeds of its loan as there was no showing as to the actual validity of the lien in connection with the prior existing mortgage.

Ameriquest must forfeit all principal and interest paid by the Fosters to Ameriquest under the home equity loan, in the amount of $8,458.16.  The Fosters are also awarded their reasonable and necessary attorney fees in the amount of $40,000.00 and costs in the amount of $2,767.89 incurred in this case.